Nice to see you again. Ms. Gerard? Yes. I represent Karen Sutherland. I'm Josephine Gerard and I represent Karen Sutherland. So Karen Sutherland is a case where she meets the enlisting for cognitive impairment 1205. And one of the requirements, she has an IQ test of 69, cognitive impairment basically the mean is 100 and if you are 1.5 deviations to standard deviations, you're in the extreme and 1205 adopts that. But you have to meet a showing that this disability occurred before you were 22. Simply having a low IQ seems to be a separate listing under 1205C and cannot by itself prove deficits in adaptive functioning. Do you agree with me on that? I agree with you, but if you have further impairments and she has severe hearing loss and garbled speech and the commissioner gives a lean if you've showed this your whole life. If you can show a finding of cognitive impairment below and IQ scores are standardized so that means that they're supposed to be lifelong. So she's at 69. You have to prove deficits of adaptive functioning. Right. Separate from the IQ test. Right. Please proceed on that. Right. Sorry. She has severe hearing loss and she has also communication loss and she has what's called pseudo seizures where she blacks out. All right. But that has to affect the way she functions. Right. So how do those added deficits affect the way she functions and where is that in the record? That's in the record in, I think, her, I'm trying to put this where that's in the record. I think that there's no, she was found to have a severe mental impairment. It's whether she meets the listing or not. And she has a, she's been found to have severe hearing loss and severe garbled speech. So her functioning that you're asking about literally comes from whether she had the residual capacity to work. And the problem with that is that her record shows she had sheltered work where she worked with someone. She's illiterate. She cannot read and write. What shows that? That is in, sorry, that's her medical treatment is, so we have, sorry, I just have to get that page number so I don't encode it here. Her social worker and her, sorry, just trying to find this a little more clear so I can give you exactly the right page number. Her reading and writing. Dr. McLean gives the full report, but we're here on, sorry, garbled speech, intelligible. And, sorry. It's on page 352. That's the psychological testing by Dr. McLean. And she tested her and she found on the WASC that she could not read and write. She's got tangential mental problems. She has difficulty answering questions. Her registration of working. She can't count. She can't spell backwards. All that together documents and supports Dr. McLean's finding. Throughout the record, her. I think the question that Judge Farris asked you was if you could point us to some evidence on the record that showed that Ms. Sutherland's prior work was, quote, sheltered work, unquote. Would you do that? Yes, I would. So, her. Her sheltered work was, if you look in the record at page 313, she has a friend who has been sort of working and helping her try to get jobs. She says, I've known Karen Sutherland since 1998. I helped her fill out. I noticed she can't read or write very well. I noticed she has a speech problem, and I helped her on the job duty with the supervisor until she could understand what she could do. I literally had to show Karen what to do, in jobs or to help her write a letter to apply. She's held 11 jobs. That's ER 313. She's held 11 jobs with 13 employers. She gets in conflict, and she actually hit a fellow employee. She has a real hard time, and I think some of it's got to do with the fact that she can't communicate. She has garbled speech, and she can't hear. But the only evidence as to her prior employment all being under sheltered conditions was at page 313, Ms. Mosqueda's statement that she helped her along with the supervisor. Right. She also has very short ñ it has to be significant gainful activity, and there's only these two jobs, and those jobs were worked with Ms. Mosqueda. So that is the point. They're not very long jobs. She does the best she can. Does she have a GED? No, she does not have a GED. And the GED problem was that she went to school in Canada, and that was the whole showing evidence before 22. She has no academic credits. In Canada, evidently in her town, did not have a special ed program, and she took classes. There's no academic education in it. There's a PE class and a construction class. She managed to get a C-minus. She states that she didn't graduate, but they pushed her along. She doesn't have a GED, but when they asked her, she thought that she had that certificate or whatever they give in Canada. It's not equivalent to the U.S. So in U.S., you have to have an academic, math, English, and some ability, and she is illiterate on a functional level. So that was the evidence for 205 so that she would meet that need. Tell me, does it matter? When we review, don't we have to look to see what in the record backs up the statements that are made? There's been some allegations that she must have sheltered work, I gather. Right. That she must have, that she is illiterate, and then we see what her training has been and what jobs she's helped. There's a number of jobs. When you have work that you have to have someone beside you helping, and that's what her friend Mesquite is stating, then that's sheltered work because it's work that you can't do independently. For instance, she did get a credential, or she thought she got a credential to be a nurse's assistant, and she learned it by one-on-one showing what she could do, but she couldn't keep the job. But she did learn that and got a nursing certificate. But the problem is, on the job, if there's any problem or change, you can't do it because you don't know. So that's why it's sheltered, because she has to have someone beside her explaining things. And she can't, she also has a real problem because she's got garbled speech and she's got bilateral, totally deaf in one ear and partial hearing in the other. So we have someone that is disabled who's functionally disabled by the adult listings. Because she meets 12-05. She has a showing before she's 22. She's got an extra physical impairment with her hearing and her speech, and she has the standard IQ scores of 69. So that should meet it. But she is not a good narrator, and they said, do you have a GED? She said, yes, no, yes, no, and it kind of just got lumped along. But we gave evidence that she doesn't have a GED. Doesn't have any academic background. So we had to put the evidence together, what was. In an ideal circumstance, it would be in the U.S., and there would be psychological testing before 22, but that's not required. Save the rest of the time for rebuttal. Yes, thank you. Thank you. Good morning. May it please the Court. I'm Jeff Staples for the Commissioner. This is a case in which expert testimony from doctors, psychiatrists, and vocational consultants supported each of the ALJ's findings that are at issue today. On the point about Listing 1205C, Nancy Winfrey, Ph.D., was a medical expert that the ALJ called to testify about this complicated medical issue, and Dr. Winfrey said that there was nothing to suggest that Sutherland satisfied the deficits in adaptive functioning that Judge Bea was asking about earlier, and that testimony is at 720-24 in the ER. Dr. Winfrey noted that Sutherland had worked for many years, despite her intellectual impairments. She obtained a GED, she went to high school, and she attended some college courses. Counsel, could I direct your attention to what's bothering me in this case? Please, Your Honor. The vocational expert was asked to give testimony and respond to hypothetical, and the ALJ said, if you have an opinion which conflicts with information in the DOT, Dictionary of Occupational Titles, will you let me know? And the expert said the expert would let her know. And then, I'm not sure they did really sufficiently respond to the discrepancy between the illiteracy and the DOT's requirement of at least some, a very modest amount of literacy for every job. There's some testimony here where the V.E. spoke to that, but our case law in Zavalin, I think it's Masaki, I'm not sure I'm pronouncing that correctly, says that the ALJ is required to reconcile that inconsistency. And I'm not so sure that the ALJ's actual findings here meet that standard. Do you want to speak to that? Certainly, Your Honor. To give Sutherland and her representative the benefit of the doubt, the ALJ asked the V.E., what if this person was also illiterate? What would that do to these jobs? And the V.E. did explain in some detail that, you know, although these are jobs at the lowest reasoning level, which, as Your Honor points out, in the DOT it does require at least some ability to read and write, these are actually not jobs that require those abilities. And the V.E. went into some detail about what it was in those jobs, how a person who was illiterate could perform those jobs. Right. Counsel, and that's what I'm saying, the V.E. did. Yes. I get that. So I'm just trying to figure out, our case law does seem to say that the ALJ is required to reconcile the inconsistency. So my question is really specific. Just in the ALJ's decision. And I'm just asking you, is it your position, and if so, why, that the ALJ's decision here satisfies this standard, please? Certainly, Your Honor. The ALJ pointed specifically to the vocational expert's testimony. So the ALJ pulled out that point about illiteracy, that this is an additional issue perhaps that requires some further resolution. And so in order to address that, this is at 50 to 51 of the ER, the ALJ notes that the vocational expert testified that if such a person were illiterate, she could nevertheless do those past jobs and the other jobs on which the ALJ relied at Step 5. So by referencing that testimony, which was pretty specific about how. . . At 50 to 51? Of the ER, it's 31 to 32 of. . . Hang on. Maybe I have a. . . Let's check here. 50 to 51 of the ER. There are two sets of numbers at the bottom. Right. I think that's what's messing me up here. I believe the ER site is 50 to 51, and then the original numbering from the SSA does is 31 to 32. This happens often, and it's. . . It's the last two pages of the ALJ's decision, if that helps. That helps a lot. I'll just go to that. That's much easier. Okay. It's the second to last paragraph of the ALJ's Step 4 and alternative Step 5 discussion. Okay, so let's look here. All right, so I'm there now, which is good. And there are two sets of numbers. And you want me to look where, please? Top of 51 or top of 32, depending on which numbers you're using. All right, so this is the part of the ALJ's testimony, or forgive me, report opinion, that you think satisfies the standard that I'm referencing. Yes, Your Honor. Zavalin. Okay. Yes. By calling out the fact that the VE did offer that specific testimony, the ALJ satisfied that, you know, resolved that any discrepancy that there was. So you think it's not necessary for the ALJ to, you know, identify the DOT requirement? No, because to the extent, well, a few things to that point, Your Honor. First of all, the ALJ, there's nothing to suggest necessarily that she was illiterate. That's different, though. That's a different problem. I'm just saying I'm not, I don't think that it's necessarily the case that there was a conflict between her abilities and the DOT in the first instance. To the extent that there was, the ALJ certainly resolved it by asking the vocational expert, well, what if this person were illiterate? I'm not saying that she is, but what if she were? Okay, even if she were, she could still do all of these jobs on which I've relied. Okay, and just quickly, because I don't want to belabor the point, but at the top of the testimony, the ALJ asked the vocational expert, there's going to be a discrepancy between your opinion and the DOT's. Will you let me know? And the V.E. said, yes, I'll let you know. And then I think didn't, is that right? The V.E. did not. The V.E. did not say, well, illiteracy is inconsistent with the DOT in this way. But the V.E. did go on to describe specifically how these specific jobs could be performed by a person who was illiterate to the extent Sutherland was illiterate. I think you've answered my question. Thank you. You're welcome, Your Honor. And let me just go on to say that there is plenty of evidence suggesting that Sutherland could read and write at least very simple things. Her husband testified that she could read notes that he left her to remind her to do things and that she would leave notes for him, for instance, if she went out of the house. You know, as I mentioned, there's a lot of evidence suggesting that she went to at least some high school or graduated from high school. There's a lot of evidence suggesting that she got a GED. So I don't think it's necessarily the case that she was illiterate. But as we've been discussing, even if she was, the ALJ explained how a person who had that limitation could do all these jobs. On the subject of the past relevant work, the vocational expert also testified that she had these past jobs that she had done for many years, and although Sutherland argues that those were sheltered work, citing Ms. Mosqueda's statement at 313, that was her co-worker, what Ms. Mosqueda said is that she and a supervisor helped Sutherland learn how to do the job until she could do it on her own. And that's not a sheltered work environment. That's just a work environment. Your co-workers and your supervisor teach you how to do something, and then you can do it, and that's a job. That's not a sheltered work environment. A sheltered work environment is a very specific, almost institutional kind of workplace, and there's really no evidence to suggest that that's how she was performing these jobs. So because we have medical expert testimony supporting the ALJ's finding about 1205C, because we have another medical expert supporting the ALJ's finding about the extent of Sutherland's hearing loss and other neurological issues, that was Lynn Jahnke, MD, and because we have a vocational expert supporting the ALJ's finding at Step 4 and her alternative finding at Step 5, substantial evidence supports all challenged aspects of the ALJ's decision, and unless this Court has any further questions, we'd ask you to affirm. Thank you very much. Rebuttal. I would like to go right to the sheltered work because Social Security ruling 83.33 states that it leans towards sheltered work, and sheltered work is a term in special education. It doesn't mean you work in a workshop away from other people. We now have full inclusion. We see workers who are impaired who are working in safe ways and places, programs. You do need to work a job independently, but anyway, let's go to the ruling. The ruling says that circumstances that indicate a strong possibility of sheltered is where the claimant is mentally impaired and also has a childhood disability, or the employer or the other interested parties do more work than the client. So we have someone who's been tested cognitively impaired. We have the ruling covering those jobs. Those jobs were very short, and as far as the literacy, we have to lean back upon the test scores and upon Dr. McLean. The other one that we're talking about is... When you say the literacy, when you say we look at what? I was looking at Dr. McLean because I feel like it's throughout the record people mentioning that she can't read. Now, the commissioner talks... Well, her husband says she can read. He said he leaves her notes, and she leaves him notes. Right. So when you tell me she can't read, that's what I'm asking. That's why I asked you earlier. What was the evidence? Dr. McLean's report that when he gave the mini mental exam, she can't read, you know, like when they tell you to read word, say, spell the word, she can't do it. And as far as the literacy standards for the DOT, that's 2,500 words. So you might be able to have, like, a first-grade reading, but that's not up to the standard of the DOT. 2,500 words is the bottom level. And when there's a discrepancy between the vocational expert and the ALJ, I read the Supreme Court basics as saying that the ALJ is in charge, and the ALJ has to write in the decision so that we can understand why she could work these jobs when she can't read and write. There's a complete discrepancy between the Dictionary of Occupation Titles and the vocational experts' jobs. I'm not concerned that what you say is true if she can't read and write, but there are things in this record that suggest that she can. What about the notes to her husband when she leaves him? Do you think that happens, or do you think that's a lie? I don't know what the notes look like. Because, you know, they do teach people who can't read and write to use symbols or to, I mean, you could use words. No, no, but I'm saying that a note to you and I might be like a whole full page or a sentence, but we don't know what the notes look like. No, we don't, but we know that the record said that they leave notes for each other. And that suggests to me that somebody's reading and somebody's writing. Now, I'm not suggesting that they're writing well, but when you say illiterate... Well, okay, so I, you know, we don't know what the notes were. But I just did want to answer this, because he's saying that there's a GED. Go ahead. And if you look at the, I think this will show it. If you look at 290, at the bottom of 290 or 271, that's her transcript from this time period that she's supposed to have a GED. There is no academic credit. She's got consumer education, construction, physical education, and she gets a pass and she gets a C plus in construction. That is not a GED. That does not show literacy. So if we're to show literacy on the psychological test, she should be able to spell a word or she should be able to spell, you know, some of the minute, you know, that's implied in there. And there's no... What do we have to do to believe if she gets a C plus she still can't read and write? Well... C plus doesn't mean... Right, but they're English and math. It means passing at least, doesn't it? Well, in the United States, when you get a GED, you have to have, you know, English courses, math courses, or you have to pass a test. But even if we were to throw this illiteracy to the side, she can't... She has garbled speech and she can't hear. So we have a communication issue that's built into the ability to communicate, and that's part of our problem here, is that if you just functionally, working a job, you have to be able to take instructions from your employer. So even if there was some different person who could read and write but couldn't hear and couldn't communicate, that would be... That's a discrepancy. She's totally deaf, doesn't she? She knows that she has some difficulty hearing. No, no, she has a severe, profound hearing loss, bilateral hearing loss in one ear, and, you know, partial. The problem is she went to Costco and got her hearing tested, but the examiner said, well, this is odd, but there's no disagreement that she has a hearing loss. So Council 290 clearly states that she hasn't graduated. Right. She hasn't graduated, and then it gives the reasons for non-graduation. So is there something that conflicts with this notion? I'm not sure it matters. No, she did know. You're right. What evidence is there that she does have a GED? There is none, but Council... Did your client mistakenly say that she had a GED at some point? They asked her several times in the hearing, do you have a GED, and she said yes, and then she said no. Okay, that answers my question. I think I know where the confusion came from. Yeah. That's fine, thank you. All right, thank you very much. Thanks. The case of Sutherland v. Saul will be submitted. And, of course, thanks, Council, for their argument.
judges: Farris, Bea, Christen